NORTHERN ASSURANCE COMPANY OF AMERICA, Plaintiff,

v.

Connie LARK, William D. Lark, Barbara Kay Nash, Sycamore Agency, Inc. and William J. Summers, Defendants.

Connie LARK and William D. Lark, Counterclaimants,

v.

NORTHERN ASSURANCE COMPANY OF AMERICA, Counterclaim Defendant.

No. TH 91–223–C.

United States District Court, S.D. Indiana, Terre Haute Division.

March 15, 1993.

Timothy J. Hulett, Harrison & Moberly, Indianapolis, IN, for plaintiff.

Robert F. Hunt, Frey Hunt Hassler & Lorenz, Terre Haute, IN, for defendants Lark and defendant Summers.

Craig M. McKee, Wilkinson Goeller Modesitt, Wilkinson & Drummy, Terre Haute, IN, for defendants.

### ENTRY GRANTING NORTHERN ASSURANCE'S MOTION FOR SUMMARY JUDGMENT, DENYING THE SUMMERS'/LARKS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND DENYING THE SUMMERS'/LARKS' MOTION TO DISMISS

TINDER, District Judge.

For the reasons discussed below, the court will declare that Northern Assurance has no obligation to provide coverage or a defense under the insurance binder and/or policy at issue in this matter. This finding on the primary issue effectively moots the other collateral claims and issues raised by the parties.

## BACKGROUND

This matter is resolved by the conclusion that the binder of insurance coverage and the subsequent insurance policy provided to Defendant Connie Lark are not enforceable against Northern Assurance. Facts material to this conclusion are not reasonably disputed on the evidence. Those facts are presented below.

Barbara Nash is an employee of Sycamore Agency, Inc., an insurance sales enterprise. Sycamore offers its clients a selection of several insurance companies from which to choose auto insurance. Defendants Connie and William D. Lark were clients of Ms. Nash. At one time, the Larks maintained an auto insurance policy with Amerisure; that policy lapsed in April or May, 1991. On June 28, 1991, Nash bound coverage for the Larks with Pafco Insurance Company. Nash then checked William's driving record, which showed a DWI and speeding tickets; Nash did not submit an application of insurance to Pafco because Nash knew that William did not meet Pafco's underwriting requirements.

Pafco, a high-risk company, has underwriting requirements that are less strict than those of Plaintiff Northern Assurance, a premium company. Northern Assurance maintains Personal Auto Acceptance Standards, which are underwriting criteria setting forth which risks Northern Assurance will insure. (Ex. 9[1] (Grieg Aff. ¶¶ 2, 4 & Ex. 1.)) The Personal Auto Acceptance Standards state as follows:

In order to qualify for any program, the named insured must be:

. . . .

---

1. Exhibits refer to the evidentiary documents in Northern Assurance's voluminous "Supporting Documents and Table of Cases Binder." The court examined all exhibits submitted by both parties. Most documents submitted by the parties were included in Northern Assurance's "Supporting Documents and Table of Cases Binder"; therefore, the court will refer to this source as a matter of convenience only.

3. Currently insured for Automobile liability coverage by a standard carrier.

4. Willing to let the company underwrite all automobile exposures in the household.

In addition to the above, risks having one or more of the following characteristics usually will not qualify. Although risks may be submitted for consideration.

***COVERAGE MAY NOT BE BOUND!!!*** [emphasis in original]

A. ANY DRIVER:

. . . .

2. Has had insurance cancelled, non-renewed or declined during the past 3 years.

. . . .

15. Estranged, separated or divorced within the past year.

(*Id.*)

On or about July 5, 1991, Nash and Connie Lark discussed the possibility of obtaining insurance for Connie Lark from Northern Assurance. Nash was aware that both William and Connie Lark were currently uninsured and that William had several driving violations of record. Connie Lark knew that she could not obtain coverage from Northern Assurance for herself *and* William, because of his driving record and the prohibitive cost he would add to the premium. Notwithstanding that neither Connie nor William met Northern Assurance's mandatory Personal Auto Acceptance Standards, on July 5, 1991, Nash offered to bind Northern Assurance to coverage for Connie Lark (only) and to submit an application to Northern Assurance.

On July 8, 1991, Nash completed a majority of a Northern Assurance application/binder for insurance (the "Binder") (Ex. 26) and mailed it to Connie Lark. Lark did not sign, return, or pay any consideration regarding the application until July 22, 1991. On the evening of July 19, 1991, William Lark drove Connie Lark's car; William's car's registration had expired. In the early morning hours of Saturday, July 20, 1991, William was intoxicated and at fault in an auto accident with William J. Summers.

Connie contacted Nash on July 22, 1991, and told Nash about the accident. Nash told Connie to bring in the application as soon as possible; Connie brought in the signed application and the initial premium payment that same day. The Agency Agreement between Sycamore (Nash's employer) and Northern Assurance (Ex. 37) required Sycamore to notify Northern Assurance within five working days after issuing a binder. After Nash received the application, Sycamore added a "1" to the "effective date" on the Binder/application and thereby changed the date from July 5, 1991 to July 15, 1991.[2] Sycamore submitted Connie's application to Northern Assurance on July 23, 1991.[3]

Sycamore did not inform Northern Assurance that, two days prior to the date Sycamore received the application for the named insured, a person other than the named insured had been in an accident with the vehicle. Nash had written "none" in the "Accidents, Convictions & Losses" section of the application sent on July 23, 1991. Although William Lark lived in Connie's household and was either an "operator" or "non-operator" of Connie's automobile, the Binder/application prepared by Nash listed Connie's name only. Sometime after receiving the application, Northern Assurance issued a policy of insurance (the "Policy") (Ex. 52) to Connie with an effective date of July 15, 1991—the (altered) effective date on the Binder/application. Connie, through Nash, submitted an Automobile Loss Notice to Northern Assurance on July 24, 1991 regarding the July 20, 1991 William Lark/William Summers accident.[4]

On October 2, 1991, Summers filed a personal injury action against William Lark in Vigo Superior Court. That Court entered a

---

**2.** Sycamore likely changed the date (without informing Connie) to make it appear as though there was no binder issued until July 15; this forward-looking back-dating would place the application within the five-day guideline established by the Agency Agreement.

**3.** The binder and the application are one in the same document. (Ex. 26.)

**4.** The court notes that the loss claim form stated that the "insured" was driving the car when the accident occurred.

default judgment against William Lark on October 31, 1991. On January 16, 1992, Summers and William Lark executed a Settlement Agreement regarding Summers' State court action. (Ex. 42.) On February 20, 1992, pursuant to the Settlement Agreement, the State court entered an Agreed Judgment in the amount of $1 million[5] against William Lark. (Ex. 40.) In exchange for Summers' promise not to enforce the Agreed Judgment against William, the Larks assigned to Summers any rights and interests they had in the Policy.[6] In a later proceeding with his insurance company regarding his uninsured motorist coverage, a panel of arbitrators awarded Summers about $25,000 for his personal and property damage. (Ex. 39.)

Under the criteria provided by Northern Assurance's Personal Auto Acceptance Standards, Northern Assurance would not have issued the Policy to Connie. Under the criteria provided by Northern Assurance's Personal Auto Acceptance Standards, Sycamore/Nash was without authority to issue the Binder to Connie. The facts known to Nash regarding Connie and William prior to the time Nash issued the binder plainly indicated that Connie was an unacceptable risk for the Northern Assurance coverage bound by Nash. The criteria that Connie failed to meet include the following: (1) The Policy application did not name all automobile exposures in Connie's household (William lived in her house but was not listed as a named insured); (2) Connie's insurance had been cancelled/non-renewed during the past three years (the Amerisure policy); (3) Connie had been divorced within the past year; and, (4)

Connie was not then-currently insured for automobile liability by a standard carrier.

Had Nash disclosed the true nature of the Connie Lark and William Lark risk to Northern Assurance within the required time period under the Agency Agreement, then Northern Assurance would not have issued the Policy. Had Nash disclosed that William Lark had been at fault in a collision on July 20, 1991, then Northern Assurance would not have issued the Policy.

## DISCUSSION

In addition to the accusations of bad faith, material misrepresentations, and fraud volleyed between the parties, counsel have prosecuted this action with a general unsavory air of incivility.[7] The court intends that the ruling in this matter be made from a neutral perspective, unfettered by the needless invectives traded back and forth by counsel. The court is concerned with the law and evidence—only—and not counsels' (lack of) regard for each other's ability to argue a position. This is essentially a battle over money: Summers desires more money and Northern Assurance does not wish to give it to him. This court's ultimate conclusion— that the binder and Policy are not enforceable contracts—is not a judgment about the character of the parties involved. It is a function of the undisputed facts and applicable law.

It is undisputed that Nash partially completed a Northern application/binder and sent it to Connie Lark on or about July 5, 1991. It is undisputed that Northern Assurance in fact issued the Policy to Connie Lark with an effective date of July 15, 1991. It is

---

**5.** The Settlement Agreement purports that the amount represents $500,000 in actual damages and $500,000 in punitive damages.

**6.** William Summers, Connie Lark, and William D. Lark are represented by the same counsel in this matter and have identical interests. These Defendants/Counterclaimants will be collectively referred to as "Summers/Larks"—an inelegant but unambiguous label.

**7.** The briefs filed on behalf of Summers and the Larks are steeped with disparaging, inflammatory, and just plain snide comments. Northern Assurance's efforts similarly wandered from the true path to that offensive road less traveled.

Arguments laden with this kind of "commentary" are distracting and become tiresome quickly.

In addition to the tone of the parties' arguments, Northern Assurance's method of titling the documents filed in this matter requires correction. Local Rule 5.1(a) states that "The title of each pleading must be set out on the first page." In addition to using an incorrect caption—which included a third-party claim that is no longer active—Northern Assurance placed the title of each document on the second page. The reason for the Rule is simple. It exists so the Clerk can easily docket the documents filed. The court would appreciate compliance with Local Rule 5.1(a) in the future.

further undisputed that the automobile covered by that Policy was involved in an accident with Summers on July 20, 1991. Therefore, if the Policy and/or Binder are not void or otherwise unenforceable, then Northern Assurance would be obligated by those contracts to provide Connie Lark coverage for the July 20, 1991 accident per the terms of the policy.

Northern Assurance's Amended Complaint and subsequent arguments assert a variety of theories to avoid liability under the Policy. One theory focusses upon the conduct of Sycamore [8] and concludes that (1) the Binder is voidable because Sycamore executed it outside the scope of its agency with Northern Assurance, and (2) the resulting Policy is voidable because Sycamore completed and forwarded the application outside the scope of its agency with Northern Assurance because Sycamore misrepresented material matters to Northern Assurance, its purported principal. Given the court's findings that Sycamore in fact acted outside the scope of its Agency Agreement and misrepresented material matters to Northern Assurance, the court concludes that the Binder and Policy are voidable by Northern Assurance.

## I. NORTHERN ASSURANCE IS NOT OBLIGATED TO PROVIDE COVERAGE UNDER THE BINDER BECAUSE THE BINDER IS NOT ENFORCEABLE AGAINST NORTHERN ASSURANCE

Connie does not have the legal authority *unilaterally* to bind an insurance company to a contract of insurance. Northern Assurance did not issue the Binder to Connie Lark: Sycamore issued the binder to Connie Lark. It is axiomatic that Sycamore must have contractual or common law authority to act on behalf of Northern Assurance to bind Northern Assurance to the Binder with Connie Lark.

Summers and the Larks argue merely that Sycamore, through Nash, "believed" that it was an agent of Northern Assurance and therefore Sycamore had the authority to bind Northern Assurance to the contract called a

Binder. The question of agency is not resolved by referring to deposition answers regarding what the purported-agent "believed"; instead, this issue requires an analysis of the circumstances to determine whether Nash was a contractual or common law agent. Sycamore was in fact not acting in the capacity as Northern Assurance's contractual or common law agent when Sycamore issued the Binder.

### A. Sycamore Was Not Acting as Northern Assurance's Contractual Agent

Agency is a consensual agreement between the principal and agent, *Hope Lutheran Church v. Chellew*, 460 N.E.2d 1244 (Ind.Ct.App.1984); the keystone of the agency relationship is the principal's ability to define and control the agent's activities. *Sutton v. Sanders*, 556 N.E.2d 1362 (Ind.Ct. App.1990); *Delk v. Board of Comm'rs of Delaware County*, 503 N.E.2d 436 (Ind.Ct. App.1987). The Agency Agreement (Ex. 37) is a contract in which Sycamore and Northern Assurance agree that Sycamore Agency shall be Northern Assurance's Agent in Terre Haute, Indiana. The Agency Agreement is the definitive document controlling the relationship between Sycamore and Northern Assurance. The Agency Agreement provides Sycamore the following authority:

> Agent shall have the authority to receive and accept proposals for contracts of personal lines and commercial lines insurance (as defined by Company) as Company and Agent have authority lawfully to make; subject, however, to the restrictions placed upon Agent by the laws of the state ... to the terms and conditions set forth herein, and to such general and specific instructions, authorizations, restrictions and criteria as may from time to time be given to Agent by Company in writing.

(Agency Agreement, ¶ 2.) One "term[ ] and condition[ ] set forth" in the Agency Agreement regards notice from the agent to the principal.

8. Given that a distinction between Nash and Sycamore is irrelevant for the purposes of this matter, the court will refer to both under the name "Sycamore."

Agent agrees to notify Company in writing of all endorsements and certificates of insurance issued and of all contract of insurance accepted not later than the fifth (5th) working day following such issuance or acceptance. Agent agrees to notify Company in writing of all binders issued or insurance bound not later than the fifth (5th) working day following such issuance or binding, whichever occurs first.

(*Id.* ¶ 5.) One set of "specific instructions, authorizations, restrictions and criteria as may from time to time be given to Agent by Company in writing" is the Personal Auto Acceptance Standards. ·(Ex. 9 (Grieg Aff., Ex. 1).) [9]

Connie plainly did not meet *mandatory* requirements of Northern Assurance's Personal Auto Acceptance Standards. She did not currently have auto insurance and she was not able to allow Northern Assurance to cover William—he was indisputably an unacceptable risk. The Personal Auto Acceptance Standards, which are implied into the Agency Agreement, expressly forbade Sycamore from binding coverage to an applicant with Connie's characteristics.[10] The Agency Agreement, therefore, expressly directed the agent not to bind coverage for precisely the kind of risk presented by Connie Lark. The Agency Agreement is the definitive expression of the scope of Sycamore's authority to act on behalf of Northern Assurance.

■ Even assuming that the Binder took effect immediately when mailed (or when discussed, as Connie argues), the Binder was not an enforceable contract between Northern Assurance and Connie Lark. Sycamore issued the Binder outside the scope of the contractual Agency Agreement. A principal is not bound to a contract executed by an agent if the agent does not act on behalf of the principal when executing the contract. *Allegheny Mutual Casualty Co. v. Franklin,* 513 N.E.2d 658 (Ind.Ct.App.1987); *Gary Hobart Savings & Loan Ass'n v. Strong,* 99 Ind.App. 422, 190 N.E. 373 (Ind.Ct.App. 1934).[11] Although Sycamore purported to act on behalf of Northern Assurance when Sycamore purportedly bound Northern Assurance to the contract (Binder), Northern Assurance was not so bound. Accordingly, Northern Assurance has no obligation to provide coverage to Connie (or William) under the Binder issued to Connie by Sycamore.[12]

---

9. See page three for text of the Personal Auto Acceptance Standards.

10. In addition to the mandatory unacceptable categories, Connie fell into some of the "discretionary" unacceptable categories.

11. Summers/Larks seem to argue that because Sycamore had a written agency agreement with Northern Assurance that it was not possible for Sycamore to do anything outside the scope of its agency with Northern Assurance. (Summers/Larks Reply Support Mot.Partial Summ.J. at 15.) Indiana law rejects this position. Undaunted, Summers/Larks further argue that the Binder language "unquestionably creates the appearance of authority on the part of Nash to act on behalf of the Company, because the Company supplied it to Sycamore who in turn sent it to Connie. She thus acted within the scope of that authority in binding this coverage." (*Id.*) The fallacies in this bootstrapped "argument" are multiple. Sycamore did not have any manner of "apparent authority" (see below). Regardless of the "binding" nature of the Binder's language, Sycamore plainly had no authority to bind Northern Assurance to it (see below). Finally, the (recurrent) implicit notion that Sycamore acted in the scope of its agency because Connie in fact received/relied on the Binder is a lost sheep among the relevant legal issues. in this matter. Whether or not Connie relied on the Binder is irrelevant to the issue whether Sycamore had authority to bind Northern Assurance ·to the Binder. Connie's reliance may be an argument for enforcing the Binder, but it is not an argument for enforcing. it *against Northern Assurance.*

12. *After Sycamore learned of the accident,* Sycamore unilaterally altered the date of the binder to conform to the five-day notice requirement of the Agency Agreement. Sycamore's failure to provide Northern Assurance notice within five days after issuing the Binder on July 5, 1991 (assuming it was actually issued or bound at all) also breached the Agency Agreement. Sycamore's post-accident sham alteration of the effective date has every indication of an effort to cover its own backside to avoid liability to Connie Lark. Sycamore's conduct in changing the date and then forwarding the application to Northern Assurance without a word spoken about the accident (or other fatal characteristics of Connie Lark's risk) appears an attempt to entice Northern Assurance to issue the back-dated Policy to relieve Sycamore of potential liability for the Binder. With purported "agents" like this, who needs enemies?

### B. Sycamore Was Not Northern Assurance's Apparent Agent; Sycamore Did Not Have Apparent Authority to Issue the Binder

 In addition to agency arising by written or parol agreement, an agency relationship may be implied by conduct also. This is the common law concept of apparent agency. Even if Northern Assurance and Sycamore had no express agency agreement, Sycamore could have been acting as Northern Assurance's agent vis-a-vis Connie Lark if, and only if, Northern Assurance had acted toward Connie such that she would have been instilled with the reasonable belief that Sycamore was an agent for Northern Assurance. *Swanson v. Wabash College*, 504 N.E.2d 327 (Ind.Ct.App.1987); *Hope Lutheran Church*, 460 N.E.2d at 1248. The evidence establishes that Northern Assurance had no contact with Connie regarding the Binder; absent any manifestation *by Northern Assurance*, there can be no apparent agency.

 Moreover, Sycamore had neither the actual or "apparent" authority to issue to Connie Lark a Binder binding against Northern Assurance. Apparent authority is similar to apparent agency and requires a manifestation by the principal to the third party. There was no such manifestation in this case. Merely by providing Sycamore with Northern Assurance application forms, Northern Assurance did not instill Connie with the reasonable belief that Sycamore could bind coverage for *any* type of risk that Sycamore saw fit.[13] Almost every contractual agent will have some indicia of authority from the principal; however, it would pervert the legal principle to say that every agent therefore has "apparent" authority to bind the principal to any type of contract.

 Even if there was an apparent agency, it would be irrelevant. The conclusion that Sycamore issued the Binder outside the scope of its agency relationship applies with equal force whether the agency relationship is created by contract or implied by common law. Plain and simply, Sycamore had no authority to act on behalf of Northern Assurance when Sycamore issued the Binder to Connie Lark under the circumstances known to Sycamore at the time.

### C. The Public Policy Basis of *American Underwriters Group, Inc. v. Williamson* Does not Obligate Northern Assurance to Provide Coverage Under the Binder

 *American Underwriters Group, Inc. v. Williamson*, 496 N.E.2d 807 (Ind.Ct.App. 1986), obligates auto insurers to provide coverage to innocent third-parties, even if the company's insured committed fraud in applying for the policy. Although *Williamson* precludes an insurer from avoiding an otherwise-valid contract on the basis of fraud, it does not apply to make an insurance binder binding on an entity not a party to the binder. Indiana public policy may work alchemy to gloss over fraud between signatories to an auto insurance contract. However, it would seem that no dose of public policy could bind an entity to a contract to which it had no legal connection. Given the conclusion that Sycamore issued the Binder outside the scope of its agency with Northern Assurance, Northern Assurance has *no* connection the Binder. Thus, Northern Assurance is not trying to "get out of" the Binder and Indiana law does not place Northern Assurance within the Binder.

In sum, Northern Assurance in entitled to a declaration that it is not obligated to provide any type of coverage under the Binder,

---

**13.** Summers/Larks argues that the binder document itself creates an immutable apparent agency between Sycamore and Northern Assurance. (Summers/Larks Reply Support Partial Summ.J. at 13–14.) This is incorrect. Summers/Larks cite the "binding" language of the Binder itself as proof that Sycamore is an agent of Northern Assurance—the Binder says nothing about Sycamore and cannot denote that Sycamore is Northern Assurance' agent. The issue is not whether the Binder contains binding language (it does), the issue is whether the Binder is a communication by Northern Assurance that Sycamore has the *authority* to act on behalf of Northern Assurance to bind Northern Assurance to the Binder (it does not). By Summers'/Larks' logic (?), anyone—whether they be an insurance agent or pipefitter—would have the "apparent" authority to bind Northern Assurance as long as the person had Northern Assurance forms. This position thoroughly misperceives the thrust of apparent agency.

because the Binder is not an enforceable contract between Northern Assurance and Connie (or William) Lark.

## II. NORTHERN ASSURANCE IS NOT OBLIGATED TO PROVIDE COVERAGE UNDER THE POLICY BECAUSE THE POLICY IS VOIDABLE BY NORTHERN ASSURANCE

██ Even though the Binder is not enforceable against Northern Assurance, Northern Assurance is potentially obligated to provide coverage to Connie (or William) under the Policy, which is a separate contractual agreement. Northern Assurance executed the Policy on or about July 24, 1991; the Policy stated an effective date of July 15, 1991. It is undisputed that Connie Lark did not return the Policy application to Sycamore until after the accident in question occurred. Accordingly, notwithstanding the pre-accident effective date (based on the false date supplied on the Binder), Northern Assurance did not execute the Policy until after the accident occurred. Northern Assurance made all conceivable arguments in an attempt to have the Policy declared unenforceable.[14] The court need not pass on the merits of each of these arguments, because there are at least two very sound reasons the Policy cannot be enforced against Northern Assurance.

██ Under Indiana law, an enforceable contract of insurance requires the standard elements necessary in any other contract. *Pekin Ins. Co. v. Wheeler*, 493 N.E.2d 172, 173 (Ind.Ct.App.1986). A contract of insurance requires a meeting of the minds between the insurer and the insured on the essential elements of the contract, foremost of which is the nature of the risk insured. *See id.* at 173–74. A material misrepresentation or omission regarding substantial factors affecting the nature of the risk insured upsets any mutuality of understanding between the parties and renders the insurance contract voidable by the insurer. *Watson v. Golden Rule Ins. Co.*, 564 N.E.2d 302 (Ind. Ct.App.1990) (health insurance).

The application Sycamore completed, signed, and presented to Northern Assurance misrepresented material facts regarding Connie Lark's circumstances. Moreover, even if the application form itself had not contained fraudulent misrepresentations, Sycamore plainly withheld significant risk-oriented facts from Northern Assurance when Sycamore presented the application for approval. Lastly, there is no dispute that the Policy was not even presented to Northern Assurance until after the accident occurred. Neither Sycamore nor Connie Lark disclosed to Northern Assurance that Northern Assurance was about to back-date a policy for an automobile that already had been in an accident (caused by a driver not covered by the policy).

In the face of Sycamore's misrepresentations and knowing omissions to Northern Assurance regarding Connie's application, Summers and the Larks first argue that the Policy was not fraudulently procured because all facts were known to Northern Assurance by imputation through its agent—Sycamore. (Summers/Larks Resp.Mot.Summ.J. at 10–11; Summers/Larks Reply Support Mot.Partial Summ.J. at 10–11.) The position that the policy-dooming information known by Sycamore was imputed to Northern Assurance is unsound for two reasons. First, as discussed above, Sycamore was not Northern Assurance's agent for purposes of the application, because Sycamore submitted that application outside the scope of its agency relationship with Northern Assurance. Therefore, the principle of imputed knowledge does not impute Sycamore's knowledge of Connie's situation to Northern Assurance. Second, Sycamore's own material misrepresentations and knowing omissions played a substantial role in Northern Assurance's decision to issue the Policy. Even if one could conceive of an

---

**14.** One last comment about the parties' briefs in this matter. In many respects, they were needlessly lengthy and often distracting rather than instructive. While some may credit that as thorough advocacy, our Local Rules establish very rough parameters for how much "thoroughness" counsel should need to present to the court. The

biggest offender, literally, was Northern Assurance's forty-two page Reply Brief, which was excessive in size and manner. The Summers/Larks' Objection to leave to file that overblown brief was well taken and is GRANTED. However, the outcome of this matter was clear without referring to the Reply.

"agent" who misrepresents material matters to its principal, the agent's own acts would preclude use of the common law fiction of imputed knowledge.

This case must be viewed as a matter in which an applicant and an insurance agent/broker both misrepresented and omitted several integral facts regarding an application for insurance, where the insurance company had no knowledge of this kind of conduct or of the true facts associated with the risk. Given the law of contracts in general, and the law of insurance contracts in particular, this case presents a paradigm example of a contract voidable by the insurance company. Summers and the Larks argue that even if the Policy is otherwise voidable, *American Underwriters Group, Inc. v. Williamson*, 496 N.E.2d 807 (Ind.Ct.App.1986), prohibits Northern Assurance from challenging the Policy on any basis. Summers and the Larks seem to argue that, under *Williamson*, once an insurer places its pen to an auto insurance policy that purports to provide coverage for a period during which a claim occurs, the insurer is absolutely bound to that policy—no matter what. That is, even if the policy application process is replete with fraud and if the policy does not even exist until after the occurrence of the accident in question, an insurer is bound to the policy merely because it is back-dated to a date before the accident.

This court's October 7, 1992 Judgment Granting Defendants' Motion to Dismiss and accompanying Entry discussed the principle and policy of *Williamson* as applied in the context of the allegations of Northern Assurance's original Complaint. Northern Assurance's Amended Complaint and evidence submitted in connection with the parties' summary judgment motions have substantially distinguished the issues from those presented by the original Complaint. The court's October 7, 1992 Judgment was premised on the belief that Sycamore properly issued the Binder and that the Policy naturally flowed from the Binder. The evidence now establishes plainly that this was not the case. The Binder is not binding on Northern Assurance; therefore, the Policy must stand or fall on its own merit, unconnected to the former belief that Northern Assurance was bound by the Binder.

Do Indiana's financial responsibility statutes preclude an insurer from avoiding an auto insurance policy that was procured by fraud after an accident occurred? Summers and the Larks seek coverage under the Policy based solely on the fortuitous event that the Policy was back-dated to the (purported) Binder date. As the court found in the October 7, 1992 Judgment & Entry, if the Binder were enforceable against Northern Assurance, then the Binder/Policy combination contract would be unavoidable. As the case is postured currently, it was as if Connie Lark applied for insurance in the first instance *after* the accident occurred. Thus, the precise issue presented is whether Indiana law would preclude an insurer from avoiding a fraudulently-procured auto policy if the policy was applied-for and executed after an accident but yet was dated effective before the accident.

This matter is substantially distinguishable from *Williamson* in fact, principle, and result. While Indiana has a public policy favoring insurance compensation for injured third-party motorists, that public policy does not work to ensnare every defrauded insurer. *Williamson* addressed the situation in which the auto insurance policy was executed and in effect prior to the accident occurrence. The (rather singular) facts of this case distinguish it from *Williamson* because the only pre-accident contract, the Binder, is not enforceable against Northern Assurance. Although *Williamson* increases an insurers' risk because insurers will be bound to a policy procured by fraud before an accident, *Williamson* does not bind insurers to contracts procured by fraud after an accident occurs.

If an uninsured person who caused an accident could make false statements to an insurer in an attempt to get binding retrospective insurance coverage, then Indiana law would plainly reward fraud solely in the name of providing insurance compensation. A policy that promotes or rewards this kind of fraud is, on balance, contrary to the public

interest.[15] The fact that Northern Assurance back-dated the Policy to a period prior to the accident does not change this result. The Policy itself was not in existence before the accident and was back-dated solely in reliance on the Binder date. Of course, the Binder is fatally flawed; moreover, the Binder date itself was the product of a fraudulent act by Sycamore. Even if one could imagine a case in which an insurer could be held to a post-accident pre-back-dated policy, this is not such a case.

*Williamson,* a decision from the Court of Appeals of Indiana, is persuasive rather than precedential authority regarding Indiana law; *Williamson* predicts what the Supreme Court of Indiana would hold. Even if *Williamson* had inferred that a post-accident policy procured by fraud was unavoidable, this court finds that the Supreme Court of Indiana would likely not read the financial responsibility statutes as stating public policy that post-accident fraudulent conduct binds insurers. Were the Supreme Court to consider the issue before this court today, the Supreme Court would likely find *Slaby v. Cox,* 250 Kan. 429, 827 P.2d 18 (1992), persuasive authority for the conclusion this court reaches in this case. The son of the purported-insured in *Slaby* caused an accident at 12:10 am on March 22, 1989; at that time, the vehicle was not covered by any auto policy. At 3:00 pm on March 22, 1989, the purported-insured applied for auto insurance and misrepresented that no accidents had occurred. The agent bound coverage effective from 12:01 am, March 22, 1989—nine minutes before the accident. *Id.,* 827 P.2d at

19. The Kansas Supreme Court held that this kind of post-accident fraud made the back-dated policy unavoidable, notwithstanding Kansas' Indiana-like public policy of providing coverage for injured third parties. *Id.,* 827 P.2d at 23–24.[16]

The Policy was procured by fraud and is therefore avoidable by Northern Assurance; Indiana law does not prohibit Northern Assurance from avoiding the Policy on this basis. Accordingly, the court will declare that Northern Assurance has no obligation to provide any coverage under the Policy.[17]

### CONCLUSION

The conclusion that Northern Assurance has no obligation to provide coverage for Connie Lark, William Lark, or Connie's automobile in turn resolves all other outstanding issues and motions in this matter. Northern Assurance's December 22, 1992 Motion for Summary Judgment is GRANTED to the extent it seeks a judgment declaring that Northern Assurance is not obligated to provide coverage or a defense to the Larks. The Motion for Summary Judgment is further GRANTED to the extent is seeks a judgment in favor of Northern Assurance on the Summers/Larks' November 20, 1992 Counterclaim. The Summers/Larks' November 20, 1992 Motion for Partial Summary Judgment, which seeks a judgment regarding issues raised in Northern Assurance's Amended Complaint, is DENIED. The Larks' December 31, 1992 Motion to Dismiss Pleading Erroneously Denominated As "Crossclaim" (Northern Assurance's Decem-

---

15. If the Indiana public policy of providing insurance coverage to innocent injured third-parties is absolute, then it would seem better to have no-fault insurance or even to have the injured person throw darts at an insurance company matrix rather than to encourage after-the-fact fraud.

16. Summers/Larks correctly acknowledges that the only difference between this case and the facts in *Slaby* is that the Binder was issued prior to the accident—"The crucial factor is the time of the binding." (Summers/Larks Reply Support Mot.Partial Summ.J. at 18.) Thus, Summers/Larks must recognize that, once the Binder is found unenforceable against Northern Assurance, the Policy and its procurement are substantially similar to the facts in *Slaby.*

17. Northern Assurance's secondary and tertiary arguments regarding assignment of rights, uninsured motorist arbitration, election of remedies, collateral estoppel, and many others, are not material to the court's decision. The court states no opinion regarding the merits of these theories or the counter-arguments thereto. However, certain of the Summers/Larks theories against the conclusion that Northern Assurance has no obligation under the Binder or Policy have been considered and necessarily rejected. For example, the argument that Northern Assurance is conclusively bound to provide coverage because it provided a Certificate of Insurance to the State of Indiana is worthy of a summary repudiation only.

ber 14, 1992 "Crossclaim"/Counterclaim against the Larks for indemnification) is DE-NIED; Northern Assurance's December 14, 1992 Counterclaim is DISMISSED AS MOOT. Because the issues in this case have been reduced to final judgment, Northern Assurance's Motion to Consolidate this matter with cause no. TH 92–191–C is DENIED.

These rulings resolve all matters and issues presented in this matter. The court will enter an appropriate Judgment and direct the Clerk to close this cause.