## In re CAJUN ELECTRIC POWER COOPERATIVE, INC., Debtor.

### Federal Tax ID No. 72–0655799.

### Entergy Gulf States, Inc., Plaintiff,

v.

### Western Fuels Association, Inc., Triton Coal Company, Inc., and Ralph R. Mabey, Chapter 11 Trustee, Defendants.

### Entergy Gulf States, Inc., Plaintiff,

v.

### American Commercial Terminals, Inc., A Division of American Commercial Marine Service Company, and Burlington Northern and Santa Fe Railway Company, Defendants.

District No. 94–2763–B2.
Bankruptcy No. 94–11474.
Adversary Nos. 97–1002, 97–1068.

United States Bankruptcy Court,
M.D. Louisiana.

Feb. 11, 1999.

---

See also 230 B.R. 693, 230 B.R. 715.

David S. Rubin, Kantrow, Spaht, Weaver & Blitzer, Baton Rouge, LA, Lon A. Jenkins, Annette W. Jarvis and Mark Dykes, LeBoeuf, Lamb, Greene, & MacRae, LLP, Salt Lake City, Utah, John Parks, LeBoeuf, Lamb, Greene, & MacRae, LLP, Denver, CO, for Ralph R. Mabey, Chapter 11 Trustee.

Henry J. Kaim, Edward L. Ripley, and Patricia B. Tomasco, Sheinfeld, Maley & Kay, Houston, Texas, Bobby S. Gilliam, Wilkinson, Carmody & Gilliam, Shreveport, LA, for Southwest Louisiana Power Company.

Melanie R. Cohen and Benjamin Schwartz, Altheimer & Gray, Chicago, Illinois, John M. Sharp, Baton Rouge, LA, for the Committee of Certain Members.

R. Patrick Vance and Laura Leigh Blackston, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, LLP, New Orleans, LA, for American Commercial Marine Services.

Edna Ayliffe Latchem, Thibaut, Thibaut, Bacot, Latchem & Vogt, LLP, Baton Rouge, LA, Peter J. Lucas, Doherty, Rumble, & Butler, P.C., Denver, Colorado, for Western Fuels Association.

Edna Ayliffe Latchem, Thibaut, Thibaut, Bacot, Latchem & Vogt, LLP, Baton Rouge, LA, Ronald M. Martin, Holland & Hart, LLP, Colorado Springs, Colorado, for Triton Coal Company.

James R. Lackie and Mark D. Mese, Kean, Miller, Hawthorne, D'Armond, McCowan & Jarman, Baton Rouge, LA, for Burlington Northern and Santa Fe Railway.

Gerald Amero, Pierce, Atwood, Scribner, Allen, Portland Maine, Steve Chiccarrelli, Breazeale, Sachse & Wilson, Baton Rouge, LA, for Official Committee of Unsecured Creditors.

Patrick Henry, Sharp, Henry, Cernigliz, Colvin & Weaver, Homer, LA, for Claiborne Electric Power Cooperative.

John W. Hutchison, Voorhies & Labbe, Lafayette, LA, James Davidson and Mark Andrus, Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette, LA, for Southwest Louisiana Membership Corp.

John W. Hutchison, Voorhies & Labbe, Lafayette, LA, Russell Purvis, Smith, Taliaferro, Purvis & Boothe, Jonesville, LA, for Concordia Electric Cooperative, Inc.

James B. Supple, Biggs, Trowbridge, Supple & Cremaldi, Franklin, LA, Berry D. Spears, Winstead, Sechrest & Minick, Austin, TX, for Pointe Coupee Electric Membership Corp.

Tom Phillips and Courtney Smart, Taylor, Porter, Brooks & Phillips, Baton Rouge, LA, for Entergy Gulf States.

Frances M. Toole and Brendan Collins, U.S. Dept. of Justice, Washington, D.C., for Rural Utilities Service.

Matt J. Farley, Preaus, Roddy & Krebs, New Orleans, LA, Michael A. Rosenthal and Janet M. Weiss, Gibson, Dunn & Crutcher, LLP, New York City, for Louisiana Generating, LLC.

Michael R. Fontham, Noel Darce and Karen Freese, Stone, Pigman, Walther, Wittman & Hutchison, New Orleans, LA, for Louisiana Public Service Commission.

## REASONS FOR DECISION

GERALD H. SCHIFF, Bankruptcy Judge.

Cajun Electric Power Cooperative, Inc. ("Debtor"), filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 22, 1994, and on that day an order for relief was duly entered. The Debtor remained a debtor in possession until August 1995 when Ralph R. Mabey ("Trustee") was appointed and duly qualified as chapter 11 trustee.

### BACKGROUND

### I. Confirmation of Plans of Reorganization

The court has concluded hearings on confirmation with respect to three separate plans of reorganization in this complex chapter 11 proceeding, namely, (1) the plan in which the Trustee and LaGen [1] are co-proponents ("Trustee's Plan"), (2) the plan in which SWEPCO [2] and the Committee of Certain Members [3] are co-proponents ("SWEPCO Plan"), and (3) the plan in which Enron [4] and the Official Committee of Unsecured Creditors are co-proponents ("Enron Plan").[5]

### II. The Fuel Chain Objections to Confirmation

In December 1996, the Fuel Chain [6] filed objections to the confirmation of the three proposed plans, claiming that the Fuel Chain contracts were not "contracts of the Debtor" and therefore could not be rejected pursuant to section 365 of the Bankruptcy Code. The

Fuel Chain resolved their differences with both the Trustee and Enron and those objections were withdrawn. The Fuel Chain's objections to the SWEPCO Plan, however, are still viable.

### III. GSU's Preemptive Strike

The Debtor's major non-nuclear asset is the Big Cajun No. 2 power station situated in Pointe Coupee Parish near New Roads, Louisiana. Units 1 and 2 of Big Cajun No. 2 are owned entirely and are operated by the Debtor. These units were constructed and became operational between 1976 and 1981. Construction on Unit 3 began in 1979, and it became operational in 1983. Unit 3 is owned 58 percent by the Debtor and 42 percent by GSU [7]. The Debtor operates Unit 3 pursuant to a joint operating agreement executed by GSU and the Debtor.

The acquisition and transportation of coal—the fuel for the operation of Big Cajun No. 2—is at the core of this controversy. The Debtor obtains coal for Big Cajun No. 2 from WFA pursuant to a coal contract. The present version of the coal contract was executed in 1992, several years after Unit 3 became operational. WFA acquires its coal supply from Triton. WFA'S contractual obligations to Triton were guaranteed by Cajun under a guarantee agreement that was executed in May of 1991. The coal moves by rail and barge from the Buckskin Mine in Wyoming to the plant site, with BN and ACT providing the rail and barge transportation, respectively.

Being aware of claims by the Fuel Chain that GSU may have some liability in connection with coal and transportation for Unit 3, GSU initiated these two adversary proceedings. GSU is seeking a declaratory judg-

---

1. Louisiana Generating, L.L.C.

2. Southwestern Electric Power Company.

3. An unofficial committee of 7 members of Cajun Electric Power Cooperative, Inc.

4. Enron & Trade Resources Corp.

5. Enron has recently withdrawn the Enron Plan from consideration. As the court has been working on these reasons for some time, however,

such withdrawal has not otherwise been dealt with herein.

6. The term "Fuel Chain" has been used throughout this proceeding to identify Burlington Northern and Santa Fe Railway Company ("BN"), American Commercial Terminals, Inc. ("ACT"), Western Fuels Association, Inc. ("WFA"), and Triton Coal Company, Inc. ("Triton"), collectively.

7. Entergy Gulf States, Inc.

ment that (a) the Debtor is the sole principal on the contracts with WFA, Triton, BN and ACT to supply coal to the Debtor for ultimate use at Big Cajun No. 2, and (b) in the event the Debtor rejects any or all of the Fuel Chain contracts, that GSU has no liability to WFA, Triton, BN or ACT on account of such contracts.

The Trustee, in his answer and cross-claims filed in the WFA and Triton proceeding, and in an intervention in the BN/ACT case, expressly renounced the proposition that the Debtor was, in any way, acting for either GSU or any GSU-related joint venture in executing the contracts with the Fuel Chain.

This court initially granted GSU's Motion for Summary Judgment, finding that GSU was not bound as a party or obligor on either contract and that GSU was not liable to WFA or Triton under any other theory presented by WFA and Triton.[8] Final judgment in AP 97–1002, with Certification of No Just Reason for Delay, was entered by this Court on September 10, 1997. An appeal was filed by WFA and Triton and cross-appeals were filed by GSU and the Trustee with the District Court. However, based upon this court's request, the District Court remanded AP 97–1002 to this court. This court subsequently denied the pending motions for summary judgment in both adversaries and set both cases for trial.

### FACTUAL SUMMARY

As stated above, the Debtor owns generating facilities consisting of Units 1, 2 and a 58% interest in Unit 3 of the Big Cajun No. 2 coal-fired power station located in New Roads, Louisiana. In addition to the 42% participating interest in Unit 3, GSU owns a 14% interest in common facilities that service all three units at the station.[9] GSU does not own, control, contribute to, or generate electricity or receive any benefit from Units 1 and 2.[10]

As a co-owned facility, Unit 3 is operated by the Debtor pursuant to the JOPOA which was signed by the parties on November 14, 1980. The JOPOA specifically allows the Debtor to contract with itself in managing the station, including selling coal at cost to the other co-owners from the Debtor's coal inventory acquired through its own contracts.[11]

The relationship between the Debtor and the Fuel Chain began years before Unit 3 was placed in commercial operation and prior to the execution of the JOPOA.[12] Prior to the time Unit 3 came on line, the Debtor had existing contracts with the Fuel Chain in order to acquire and transport coal to Louisiana for Units 1 and 2.

One relevant contract in AP 97–1002 is the Superseding Coal Purchase Contract, Big Cajun No. 2, Units 1, 2, and 3 ("Cajun/WFA Coal Contract"), between the Debtor and WFA, executed on October 28, 1992.[13] WFA is a non-profit, member-owned corporation organized for the purpose of obtaining fuels to be used in the generation of electric energy by its members; the Debtor is a Class A member of WFA.[14]

Triton is a coal company that owns and operates the Buckskin Mine near Gillette, Wyoming. Triton was a wholly-owned subsidiary of Shell Mining Company, which was a successor-in-interest to the mining interests of Shell Oil Company. Zeigler Coal Holding Company purchased Triton from

**8.** Amended and Supplemental Order Resolving Claims and Final Judgment with Certification of No Just Reason for Delay; and Transcript of Oral Rulings of Bankruptcy Court of September 3, 1997.

**9.** DJ–C, Joint Ownership Participation and Operating Agreement, Big Cajun No. 2, Coal Unit # 3, Cajun Electric Power Cooperative, Inc. and Gulf States Utilities Company and Sam Rayburn G & T, Inc. ("JOPOA"), §§ 1.15, 2.1, and 2.3.

**10.** DJ–C, JOPOA, § 2.4.

**11.** DJ–C, JOPOA, § 4.4, P. 27; § 6.6, p. 40.

**12.** Amended Answer, Counterclaims and Cross Claims of Triton Coal Company, Inc. and Western Fuels Association, Inc., ¶ 14, p. 6.

**13.** DJ–IX, Superseding Coal Purchase Contract, Big Cajun No. 2, Units 1, 2 and 3, October 28, 1992 ("Cajun/WFA Coal Contract").

**14.** DJ–IX, Cajun/WFA Coal Contract, p. 1.

Shell in November, 1992.[15] Since 1978, Triton or its predecessor has had a contract with WFA for the sale of coal, coal which WFA then resells to the Debtor under the Cajun/WFA Coal Contract.[16] The current WFA/Triton Coal Contract is dated May 14, 1991, and is attached to the Cajun/WFA Coal Contract as Exhibit "B".[17]

Since 1979, the Debtor has guaranteed WFA's performance under the various WFA/Triton agreements through a written guaranty agreement between the Debtor, WFA, and Triton.[18] The current guaranty agreement was executed on May 14, 1991, and is attached to the WFA/Triton Coal Contract as Exhibit "D", and is included in Exhibit "B" to the Cajun/WFA Coal Contract.

The relevant contract in AP 97–1068 is a written base contract (Coal Transportation Agreement ICC–BN–C–0774 By and Between Burlington Northern Railway Company and Cajun Electric Power Cooperative, Inc.) and subsequent amendments (the "BN/Cajun Contract") between the Debtor and BN providing for the rail transportation of coal for use at the three-unit Big Cajun No. 2 generating plant.[19] BN first began transporting coal for the Debtor under tariffs in 1979.

Also pertinent in AP 97–1068 is a written base contract (Revised and Restated Agreement No. 42875 Dated September 27, 1984 Between Cajun Electric Power Cooperative, Inc. and American Commercial Terminals, Inc.) and subsequent amendments (the "Cajun/ACT Contract") between the Debtor and ACT for the barge transportation of coal for use at the three-unit Big Cajun No. 2 generating plant.[20] The first contract to barge coal for use at Big Cajun No. 2, Units 1 and 2, was signed on June 23, 1975, with the first coal transported in July 1979.[21]

15. Tr. 5/5/98, p. 162, line 1 (Buchanan).

16. DJ–FP, Contract for Sale and Purchase of Coal Dated September 28, 1978 As Amended and Restated Effective May 14, 1991 Between T Triton Coal Company and Western Fuels Association, Inc. ("WFA/Triton Coal Contract").

17. DJ–IX, Cajun/WFA Coal Contract, p. 3.

18. DJ–FP, Exhibit D To Contract for Sale and Purchase of Coal Dated September 29, 1978, as Amended and Restated Effective May 14, 1991,

## DISCUSSION

### A. AGENCY RELATIONSHIP AS TO BIG CAJUN NO. 2, UNIT III

No party in interest suggests that GSU either is a signatory to any of the Fuel Chain contracts or explicitly agreed to be bound by the terms of those contracts. What is in dispute, however, is whether, under principles of the law of agency, GSU is bound as an obligor under those contracts. Stated differently, was the Debtor acting, in whole or in part, as agent on behalf of GSU when it entered into the contracts with the Fuel Chain, thus obligating GSU to such contracts?

Pursuant to choice of law provisions contained in each of the applicable contracts, the WFA and Triton contracts are governed by Wyoming law, the BN contract by Missouri law, and the ACT contract by Indiana law. The states of Louisiana, Wyoming, Missouri and Indiana all follow the principles contained in the Restatement (2nd) of Agency ("Restatement"). Accordingly, the court will focus upon those principles, as well as relevant principles of state law.

An agency relationship is never presumed. *Hickey v. Centenary Oyster House*, 690 So.2d 858 (La.App. 2d Cir.1997). The party seeking to rely upon the agency relationship, in this instance the Fuel Chain, has the burden of proving the existence of such relationship. *Barrilleaux v. Franklin Foundation Hospital*, 683 So.2d 348, 354 (La. Ct.App.1996), *cert. denied*, 686 So.2d 864 (La. 1997). Under Louisiana law, an agent is one who acts for or in the place of another with authority from the latter. *See*, La.Civ.Code arts. 2985, *et seq.* "Control of the agent by

Between Triton Coal Company and Western Fuels Association, Inc., Guaranty Agreement ("Guaranty Agreement"), p. 1.

19. GSU 795—Redacted copy of BN Contract.

20. GSU 796—Redacted Copy of ACT Contract.

21. Id.

the principal is the essential element in an agency relationship." *Aupied v. Joudeh*, 694 So.2d 1012 (La.App. 5th Cir.1997); *see, also, Donovan v. Standard Oil Co.*, 197 So. 320, 324 (La.App.1940) (noting that the ability to exercise control or influence over the conduct of another is "the essential test in determining whether the relation of .... principal and agent exists or does not exist between persons bound by contractual relations.")

■ The *"essential* test in determining whether the relation of ... principal and agent exists or does not exist between persons bound by contractual relations" is whether the principal has power to control the agent. *Donovan v. Standard Oil Co.*, 197 So. 320, 324 (La.Ct.App.1940) (emphasis added). This control must extend to "both the means and the details of the process by which the alleged agent is to accomplish his task." *Texas Commerce Bank—El Paso, Nat'l Ass'n v. Marsh Media of El Paso (In re Carolin Paxson Advertising, Inc.)*, 938 F.2d 595, 598 (5th Cir.1991). *See also, U.S. v. Tianello*, 860 F.Supp. 1521, 1524 (M.D.Fla. 1994) ("if a party controls only the outcome of the endeavor, and not the means used to achieve the outcome, then an agency relationship does not exist.").[22]

Section 1 of the Restatement provides:

(1) Agency is the fiduciary relation which results from the manifestation of consent by one person to another that the other shall act on his behalf and *subject to his control*, and consent by the other so to act. (Emphasis added).

Comment (b) to Section 1 of the Restatement provides, in part,

When it is doubtful whether a representative is the agent of one or the other of two contracting parties, the function of the court is to ascertain the factual relation of the parties to each other an in so doing can properly disregard a statement in the agreement that the agent is to be the agent of one rather than the other, or a statement by the parties as to the legal relations which are thereby created. The agency relation results if, but only if, there is an understanding between the parties which, as interpreted by the court, creates a fiduciary relation in which the fiduciary is subject to the direction of the one on whose account he acts. *It is the element of continuous subjection to the will of the principal which distinguishes the agent from other fiduciaries and the agency agreement from other agreements.* (Emphasis added).

*See also, U.S. v. Tianello*, 860 F.Supp. 1521, 1524 (M.D.Fla.1994). Further, Section 14 of the Restatement provides as follows:

A principal has the right to control the conduct of the agent with respect to matters entrusted to him.

Comment (b) to Section 14 of the Restatement explains that:

If the existence of an agency relation is not otherwise clearly shown, as where the issue is whether a trust or an agency has been created, the fact that it is understood that the person acting is not to be subject to the control of the other as to the manner of performance determines that the relation is not that of agency.

---

**22.** *See also, e.g., Continental Airlines, Inc. v. Boatmen's Nat'l Bank of St. Louis*, 13 F.3d 1254, 1260 (8th Cir.1994) ("essential element of an agency relationship is the principal's right to control the conduct with respect to matters entrusted to him."); *Amdura Nat'l Dist. Co. v. Amdura (In re Amdura Corp.)*, 167 B.R. 640, 645 (D.Colo.1994), *aff'd*, 75 F.3d 1447 (10th Cir. 1996); ("No principal/agency relationship exists where, as here, the purported agent is *not* subject to the alleged principal's control."); *Stuart Park Associates, Ltd. v. Ameritech Pension Trust*, 846 F.Supp. 701, 708 (N.D.Ill.1994), *aff'd*, 51 F.3d 1319 (7th Cir.1995) ("To establish an agency relationship, the plaintiff must demonstrate that the defendant had the right to supervise and control the alleged agent ...."); *Northern Assurance Co. of America v. Lark*, 845 F.Supp. 1301, 1306 (S.D.Ind.1993), *aff'd sub nom.*, 17 F.3d 956 (7th Cir.1994) ("the keystone of the agency relationship is the principal's ability to define and control the agent's activities."); *Rubin Bros. Footwear, Inc. v. Chemical Bank (In re Rubin Bros. Footwear, Inc.)*, 119 B.R. 416 (S.D.N.Y. 1990) ("No agency relationship can be established where the alleged principal lacks the essential right of control over the alleged agent."); *Morgan v. Kobrin Securities, Inc.*, 649 F.Supp. 1023, 1032 (N.D.Ill.1986) ("The principal's right of control is the *most* important aspect of that relationship. Where there is no right of control, there is no agency relationship.").

With these general principles in mind, we turn to the following relevant portions of the JOPOA:

4.1 *Agency Appointment:* GSU and Sam Rayburn each hereby appoints Cajun as their agent to act on their behalf during the term of this Agreement and authorizes (sic) Cajun in the name and on behalf of GSU and Sam Rayburn to take all actions during the term of this Agreement which, in the absolute discretion and judgment of Cajun, shall not be exercised unreasonably, are deemed necessary or advisable....

5.1 *Commercial Operation:* Cajun, as Project Manager and agent of the Co-owners shall have full control over the planning, licensing, acquiring or permits, design, construction, operation, maintenance, decommissioning, storage, and disposition of coal Unit 3.... Cajun shall have the sole right to cancel or delay construction of Coal Unit 3 due to Force Majeure or Cajun's inability to finance.

6.6 *Fossil Fuel:* Cajun shall have the authority and responsibility to manage all fossil fuel for coal Unit 3 in accordance with this Agreement and Exhibit "F".

7.2 *Information:* Nothing in this Agreement shall be deemed to require Cajun to reveal to any Co-owner any confidential or proprietary information received from third parties which Cajun is obligated to hold in confidence. If requested by any Co-owner, Cajun will in good faith attempt to obtain a release of such obligation with respect to such information as any Co-owner needs for submittal to a governmental authority or for any other proper purpose.

7.5 *Management Advisory Committee:* A Management Advisory Committee composed of representatives of the Co-owners shall be established to serve in an advisory capacity only and to make recommendations to Cajun as Project Manager. The existence and recommendations of the Committee shall not operate as a restriction on the rights, powers, and authority granted to Cajun in this Agreement, and Cajun may accept or reject any such recommendations.

7.6 *No Legal Partnership:* Notwithstanding any provision of this Agreement, the Co-owners do not intend under Louisiana or Texas law to create hereby or by their actions as Co-owners any joint venture, partnership, association, or trust, or render the Co-owners liable as partners or trustees. No Co-owners or group of Co-owners shall be under the control of or shall be deemed to control any other Co-owner or other Co-owners as a group.

8.2 *Authority for Cajun to Manage, Control, Maintain, and Operate:* Cajun shall have plenary authority to manage, control, maintain, and operate Coal Unit 3 and shall take all steps which it deems necessary or appropriate for that purpose. As the Project Manager of Coal Unit 3, Cajun will manage, control, maintain and operate Coal Unit 3 in all respects as if Cajun were the sole owner of Coal Unit 3.

Cajun and the other Co-owners agree that Cajun will operate coal Unit 3 as a separate unit for economic operation and Cajun will not be required to run the unit (but may at Cajun's absolute option) when other capacity and energy is available to Cajun at a lower cost than from Coal Unit 3.

8.5 *Operating Account:* Prior to the Commercial Operation of Coal Unit 3, Cajun shall establish a separate account or accounts (the "Operating Account").... and Cajun, as agent for all Co-owners, has the sole right and authority to withdraw and apply funds as necessary to pay Costs of Operations.

8.6 *Scheduling and Dispatching:* Cajun shall have plenary authority for the hourly scheduling and dispatching of Coal Unit 3 generation. Cajun scheduling and dispatching procedures shall conform to good utility practices.

Even a casual perusal of the foregoing provisions supports the following conclusions:

—in addition to having full control over the construction of the unit, the Debtor did and does manage Unit 3 as its own;

—the Debtor may enter into agreements which it may keep from GSU absent showing of good cause;

—the Debtor may consider, but need not follow, GSU's requests at Management Advisory Committee meetings; and

—the Debtor otherwise has the sole right, plenary authority, and absolute discretion to operate and manage Unit 3.

The foregoing factors clearly do not create an indicia of an agency relationship as they unquestionably demonstrate an absence of GSU's right of control over the Debtor.

The Fuel Chain also relies upon the "Fossil Fuel Management Plan" [23] as creating an agency relationship between the Debtor and GSU. That plan grants the Debtor the authority to purchase and arrange transportation for the coal required for Unit 3.[24] In carrying out these activities, however, the Debtor is only to keep GSU "informed of the Fossil Fuel Management Plan." [25] The Fossil Fuel Management Plan grants GSU no rights or choice in the procurement of coal.

In addition to the foregoing, the parties' day-to-day practices provide ample proof of GSU's lack of control over the Debtor concerning the operation of Unit 3. Daniel MacLeod, who has been personally involved in the Debtor's fuel and transportation negotiations,[26] testified that he has never consulted GSU in contract negotiations,[27] nor has he ever consulted GSU over the terms of the contracts.[28] In other words, "GSU was not part of the issue. We were buying coal for the plant." [29] Mr. MacLeod was not aware of the existence of any document whereby GSU agreed to be directly liable on the contracts.[30]

GSU's Phil Harris confirmed his employer's non-role in Fuel Chain negotiations, testifying that GSU has never given the Debtor any direction in negotiation of the contracts.[31] He also testified that GSU had and has no input in such negotiations,[32] and that GSU indeed believes that it has no right for input into the Debtor's negotiations as the JOPOA provides solely for a management "advisory" committee.[33] Mr. Harris testified that the Management Advisory Committee is just what the name implies: an advisory committee; that the "MAC" meetings are informational only,[34] with 95 percent of each meeting consumed with the Debtor telling GSU what has already happened, not what will happen; [35] that no decisions are made at these meetings; [36] that GSU gives the Debtor no instruction at these meetings; and, while GSU may make recommendations, the Debtor need not follow them.[37]

Moreover, if GSU wants to visit Unit 3, its representatives must go through the same procedures every other visitor does to gain access.[38] GSU has no input into the Unit 3 budget,[39] and has no control over the operations of Big Cajun No. 2.

Based upon the foregoing, the court finds that the JOPOA did not create an agency relationship between the Debtor and GSU. There certainly are duties and responsibilities created by the JOPOA, which establishes the relationship between the signatories thereto. The Debtor certainly had fiduciary responsibilities to GSU under the

23. Exhibit F to the JOPOA.

24. JOPOA, Exhibit F at ¶¶ 1.4–1.5.

25. *Id.* at ¶ 1.8.

26. Mr. MacLeod, May 8, 1998, p. 20, Ins. 16–18.

27. Mr. MacLeod, May 8, 1998, p. 22, Ins. 10–16.

28. Mr. MacLeod, May 8, 1998, p. 23, Ins. 4–8.

29. Mr. MacLeod, May 8, 1998, p. 76, Ins. 20–21.

30. Mr. MacLeod, May 8, 1998, p. 37, Ins. 1–11.

31. Mr. Harris, May 6, p. 192, Ins. 21–25.

32. Mr. Harris, May 6, p. 193, Ins. 1–3.

33. Mr. Harris, May 6, 1998, p. 193, Ins. 4–13.

34. Mr. Price, May 5, 1998, p. 247, Ins. 4–7; Mr. Celestine, May 8, 1998, p. 124, Ins. 5–10.

35. Mr. Price, May 5, 1998, p. 247, Ins. 12–14. Mr. Brewster, the Debtor's plant manager, gave a figure of ninety percent. Mr. Brewster, May 5, 1998, p. 193, Ins. 22–24.

36. Mr. Brewster, May 5,1998, p. 194, Ins. 8–11; Mr. Celestine, May 8, 1998, p. 124, Ins. 11–13.

37. Mr. Celestine, May 8, 1998, p. 124, Ins. 14–19.

38. Mr. Brewster, May 5, 1998, p. 191, Ins. 13–20.

39. Mr. Brewster, May 5, 1998, p. 196, Ins. 3–6.

JOPOA. But it is an untenable leap to go from acknowledging that the Debtor has certain fiduciary duties to GSU under the JOPOA to a conclusion that the Debtor had and has authority to bind GSU to contracts which the Debtor makes pursuant to the JOPOA.

The element of control is an essential element to the establishment of an agency relationship under the laws of all jurisdictions involved; in this instance, GSU utterly lacked any indication of control over the Debtor with respect to Unit 3. Accordingly, the court finds that the Fuel Chain has failed to carry its burden in establishing that the Debtor was acting as GSU's agent in entering into the contracts with the various members of the Fuel Chain.

■ The Fuel Chain relies heavily on the use of the word "agent" in the JOPOA to describe the Debtor. Of course, "[t]he 'mere use of the word 'agent' by parties in their contract cannot be held to have the effect of making one an agent who, in fact, is not.'" *In re Drexel Burnham Lambert Group, Inc.,* 113 B.R. 830, 841 (Bankr.S.D.N.Y.1990) (citations omitted).

### B. JOINT VENTURE AS TO BIG CA-JUN NO. 2

■ The Fuel Chain also argues that the Debtor executed the contracts with the Fuel Chain on behalf of a joint venture with respect to either the entire Big Cajun No. 2 plant, or with regard to Unit 3. In reasons announced on September 3, 1997, the court stated as follows with regard to the joint venture issue:

> The defendants seek to establish a joint venture relationship between GSU and Cajun with respect to the entire Big Cajun II project. I guess the reasoning for this strategy should be apparent. Gulf States' only contractual relationship is with respect to Cajun and Big Cajun II Unit 3. Coal contracts, however, and of necessity, the guarantee agreement do not relate to Unit 3, but to the entirety of Big Cajun II. Consequently, it would seem that the only way in which either Western Fuels or Triton could pin liability on Gulf States would be for the Court to find that a joint ven-

ture existed with respect to the Big Cajun II project.

> The parties have briefed the law of Louisiana on the subject of joint venture. One major element is that each joint venture[r] must have some degree of control of the enterprise. GSU clearly has no right or control over Units 1 and 2, nor does GSU contribute to either the operation or maintenance of such units. Louisiana jurisprudence further suggests that proof of several factors must be made in order to establish a joint venture. These include a contract between two or more persons establishing a juridical entity with contribution in determinant proportions in a joint effort consisting of mutual risk vis-a-vis losses and the sharing of profits. I find that there was a complete failure of proof with respect to these factors in attempting to establish a joint venture between Gulf States and Cajun with respect to Big Cajun II. As the Court previously held that the formula creates only a basis for allocation of common costs relating to GSU's interest in Unit 3, there is no other material evidence suggesting that any of those foregoing factors have been satisfied.

> I have considered the reasoning of the McNamara decision and the fact that a tax identification number was obtained and that the parties have referred to the relationship as joint ventures. These facts, however, might suggest a relationship with respect to Unit 3, but not to Big Cajun II as a whole. Cajun was named as GSU's agent in the JOA, but only insofar as Unit 3 was concerned. While defendants may seek to expand this agency relationship to the entire Big Cajun II project, the evidence does not support this conclusion.

Although the court rescinded its ruling, it did so only on the basis of agency issues. The evidence adduced at trial does not alter the court's reasoning with respect to the joint venture issue. The court believes that the above-quoted portion of its prior ruling regarding the non-existence of a joint venture is correct and the court accordingly adopts those reasons herein.

## C. EXONERATION

The Fuel Chain finally argues that if this court determines that GSU is not bound under the contracts, then the members of the Fuel Chain are nevertheless entitled to enforce GSU's promise to the Debtor to be responsible for its share of the coal contracts. The Fuel Chain takes the position they are entitled in equity to enforce GSU's promise to pay for its share, even if the promise was made to the Debtor, not to the individual members of the Fuel Chain.

■ This right of action against GSU is mentioned in the Restatement and is an alternative remedy for situations in which the principal is not bound on the contracts but has nevertheless agreed to pay its share. This doctrine, generally described outside Louisiana as equitable exoneration, allows an injured third party to enforce a promise the principal has made to the agent to pay for its fair share if the agent cannot perform its own independent promises to the third party.

■ The court does not believe that the equitable doctrine of exoneration applies because federal bankruptcy law already gives the Fuel Chain its remedy: a claim for rejection damages against the estate. Equitable exoneration applies only when the agent cannot pay the third party. Under section 365, the Debtor's obligation to pay the third party is satisfied through rejection damages. Because the Fuel Chain would receive in rejection damages all to which it is entitled, the doctrine of exoneration has no application under the present circumstances.

### CONCLUSION

The court concludes that GSU is not bound under the contracts between the Debtor and the members of the Fuel Chain under any of the theories propounded by the Fuel Chain. Within 15 days from the date of this order, counsel for GSU shall submit an order in conformity with the foregoing reasons.